Xue Zhen ZHAO, Wendy Zan, Al Qun Ding, Qi Wang, Min Qian Guan, Ping Wang, Ying Zhou, Plaintiffs,

v.

BEBE STORES, INC.,
et al., Defendants.

Nos. CV 01–10950GAFCTX, CV 02–3363GAFCTX, CV 02–3364GAFCTX, CV 02–3367GAFCTX, CV 02–3368GAFCTX, CV 02–3371GAFCTX, CV 02–3372GAFCTX.

United States District Court,
C.D. California.

Feb. 27, 2003.

---

Julie A. Su, Christina N. Chung, Julia Figueira–McDonough from Asian Pacific American Legal Center, Mark T. Drooks, John M. McCoy, Jennifer S. Berman from Bird, Marella, Boxer & Wolpert, P.C., Los Angeles, CA, for plaintiffs.

Buchatter, Nemer, Fields & Younger, Scott H. Jacobs, Elizabeth H. Murphy and Deborah E. Yim, Los Angeles, CA, for Bebe, Mashoufs, Aruan, Millen, Ostrow, Parros, Perna & Perozzi, for defendant Bebe.

## AMENDED ORDER RE: PLAIN-TIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE FIRST, SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF

FEESS, District Judge.

### I.

### INTRODUCTION [1]

Apex Clothing Corporation sews garments for clothing manufacturers, including Bebe Stores, Inc., with whom it does a majority of its business. Plaintiff Zhao, and other immigrant workers who were employed by Apex to sew garments, claim that Apex violated various federal and state labor laws, including the Fair Labor Standards Act (FLSA), regarding wages and working conditions. In the present motion for summary judgment, Plaintiffs seek a declaration that, pursuant to the FLSA, Bebe Stores is a "joint employer" with Apex and should be held responsible for Apex's labor law violations.

The joint employer determination requires a fact intensive inquiry into the relationship between Bebe Stores and Apex for the purpose of applying the "economic reality test." *Torres–Lopez v. May,* 111 F.3d 633, 639, 641 (9th Cir.1997). Under that test, the Court must examine the relationship between the employee and her de jure employer (Apex) and between Apex and the alleged "joint employer" (Bebe Stores), to determine whether a de facto employment relationship existed between the employee and Bebe Stores. Having conducted such a review, the Court concludes that, although Bebe Stores actively reviewed the work product of Apex's employees for quality control purposes and retained a monitoring company to insure that Apex (and other companies with whom it contracted) complied with applicable labor laws, Bebe Stores was not a joint employer with Apex. Apex contracted with companies other than Bebe Stores; Bebe Stores contracted with garment sewers other than Apex; Apex owned and operated its own production facility; Apex had sole control over and responsibility for hiring and firing its employees; and Apex controlled the working conditions of its employees. Considering all of these factors in light of the purposes of the FLSA and related state and federal legislation, the Court concludes that Plaintiffs may not pursue claims against Bebe Stores as their joint employer and so **DENIES** Plaintiffs' motion.

---

1. This amended order reflects no substantive change in the Court's prior order on the issues addressed herein. The only changes from the prior order are minor word changes, and corrections to typographical and spelling errors that appeared in the original order.

## II.

## FACTUAL BACKGROUND

### A. THE PARTIES

Plaintiffs are garment workers who worked at Apex as single needle operators six days a week for various time periods from November 6, 2000 to August 13, 2001. (Statement of Undisputed Facts ("SUF") ¶¶ 16–17). Plaintiffs sewed exclusively for Bebe Stores at the Apex factory. (*Id.* ¶ 18).

Bebe Stores designs, manufactures, and retails garments with the following labels: "bebe," "bebe moda," "bbsp," and "bebe san francisco." (*Id.* ¶¶ 1, 2).

Apex Clothing Corporation ("Apex") is a garment contractor that made pants, tops, dresses and dressing room curtains for Bebe Stores. (*Id.* ¶¶ 3–5). The sole owners, officers, directors, and shareholders of Apex have been Katie Chen, Edmund Chen, and Victor Chan. (*Id.* ¶ 6).

### B. BEBE STORE'S RELATIONSHIP WITH APEX AND ITS EMPLOYEES

Apex's work for Bebe Stores never constituted more than a small portion of the garments produced for Bebe; Apex was one of approximately 50 garment factories that Bebe Stores contracted with to manufacture its garments during the applicable time period. (Genuine Issues of Material Fact ("GIMF") ¶¶ 131, 134). Between 1998 and the present, Apex produced garments exclusively for Bebe Stores for some periods of time and at all other times did the majority of its production for Bebe. (SUF ¶ 10). Bebe Stores issued a steady stream of work to Apex, regularly monitored the orders it placed at Apex, and was the primary source of Apex's income. (*Id.* ¶¶ 12, 105). Bebe Stores' quality control personnel inspected garments at Apex at the beginning, middle, and end of the garment assembly process as it did at other facilities that manufactured Bebe garments. (*Id.* ¶ 56).

Bebe Stores did not exercise control over either Apex or its workers. Bebe did not assist Apex in any way with the lease or purchase of Apex's factories in El Monte, California. (GIMF ¶ 149). Nor did Bebe invest in Apex's sewing machines or other instruments and tools needed to assemble garments for Bebe Stores and Apex's other manufacturers. (*Id.* ¶ 151). Bebe Stores did not have the authority to recruit, hire, fire, layoff or recall Apex's employees, did not maintain Apex's employment records, and did not dictate the payment or employment conditions of Apex workers. (*Id.* ¶¶ 137, 138). Finally, Bebe Stores did not control the assignments of Apex employees or determine which shift an employee worked. (*Id.* ¶ 139)

In 1998, after Bebe Stores retained Apparel Resources, Inc. (ARI) to monitor and audit Bebe Stores' contractors, in accordance with U.S. Department of Labor suggestions, ARI began conducting quarterly audits of Apex. (*Id.* ¶¶ 143, 145). Bebe relied on ARI to ensure that Apex and other garment factories that produce Bebe garments comply with applicable state and federal labor laws. (SUF ¶ 113). ARI's surveillance procedures include entering a garment factory at will, observing activities of the workers, inspecting the time clock, and reviewing time cards. (*Id.*). Payroll records of individual workers, including their identities, are generally made freely accessible to ARI, which is free to interview those workers. (*Id.*). During inspections, the ARI auditor also tells garment factories what posters and signs must be posted, takes photographs, physically tours factory facilities, and visits workers at their sewing machines. (SUF ¶ 121).

## III.

## ANALYSIS

### A. LEGAL STANDARD FOR SUMMARY JUDG-MENT

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, when addressing a motion for summary judgment, this Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In this case, the Court finds that the material facts are not in dispute. The Court therefore considers whether those facts demonstrate that Bebe Stores, along with Apex, jointly employed Plaintiffs.

### B. JOINT EMPLOYER STATUS

#### 1. The Law

 Two or more employers may jointly employ an individual for the purposes of the FLSA. *Bonnette v. Cal. Health and Welfare Agency,* 704 F.2d 1465 (9th Cir.1983). Under FLSA regulations, all joint employers are individually liable for FLSA violations. *See* 29 C.F.R. § 791.2(a). "Whether an entity is a 'joint employer' under the FLSA is a question of law." *Torres–Lopez v. May,* 111 F.3d 633, 638 (9th Cir.1997). The Ninth Circuit holds that, to determine whether a joint employment relationship exists, a court must apply the "economic reality test." *Id.* Under the economic reality test, "[a] court should consider all those factors which are 'relevant to [the] particular situation' in evaluating the 'economic reality'

of an alleged joint employment relationship under the FLSA." *Id.*

The Ninth Circuit has, at various times, identified different factors as relevant to the test of whether an employment relationship exists for purposes of the FLSA. For example, in *Real v. Driscoll Strawberry Assoc., Inc.,* 603 F.2d 748 (9th Cir.1979), the Ninth Circuit used the following six factors to distinguish employees from independent contractors under the FLSA:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanence of the working relationship; and
>
> 6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 754. This was far from the final word on the subject, however.

Four years later, in *Bonnette v. Cal. Health and Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983) the Ninth Circuit used four factors to determine whether a joint employment relationship existed: "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* However, the Ninth Circuit added that "[t]he four factors...provide a useful framework for analysis in this case, but they are not etched in stone and will not be blindly applied. The ultimate de-

termination must be based 'upon the circumstances of the whole activity.'" (*Id.*) (citations omitted).

Most recently, in *Torres–Lopez*, the Ninth Circuit confronted the joint employer issue in a suit brought under the FLSA and the Agricultural Workers Protection Act (AWPA). In that case, a grower, Bear Creek Farms, entered into an agreement with a farm labor company, Ag–Labor, to provide workers to harvest Bear Creek's cucumber crop. Some of the workers brought suit against the grower for labor law violations on the theory that the grower was a joint employer with Ag–Labor. The District Court found that the grower was not a joint employer, and the plaintiffs appealed. In reviewing the trial court's decision, the Ninth Circuit identified five "regulatory factors," established by the Department of Labor, to be evaluated in assessing whether or not a joint employment relationship existed, but emphasized that these factors were not exhaustive. *Torres–Lopez*, 111 F.3d, at 639. Noting the District Court's apparent erroneous reliance on these factors to the exclusion, or unwarranted minimization, of others, the Court wrote:

> The "nonregulatory factors" considered [in earlier cases] in deciding whether a joint employment relationship existed include:
>
> (1) whether the work was a "specialty job on the production line;"
>
> (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without "material changes;"
>
> (3) whether the "premises and equipment" of the employer are used for the work;
>
> (4) whether the employees had a "business organization that could or did shift as a unit from one [worksite] to another;"
>
> (5) whether the work was "piecework" and not work that required "initiative, judgment or foresight;"
>
> (6) whether the employee had an "opportunity for profit or loss depending upon [the alleged employee's] managerial skill;"
>
> (7) whether there was "permanence [in] the working relationship;"
>
> (8) whether "the service rendered is an integral part of the alleged employer's business."

*Id.*, at 640. (citations omitted). Because the District Court had not given due consideration to these non-regulatory factors, the *Torres–Lopez* court reversed the District Court's determination that the grower and the agricultural labor company that provided the workers' services to the grower were *not* joint employers.

### 2. *Analysis*

■ Relying heavily on *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) and *Torres–Lopez*, Plaintiffs argue that the FLSA defines the employment relationship with such breadth that this Court must find that Bebe Stores is Plaintiffs' joint employer. (Mot. at 9–18). Quoting from *Torres–Lopez*, Plaintiffs observe that the Ninth Circuit "has recognized that the concept of joint employment should be defined expansively under the FLSA." (*Id.* at 9, quoting *Torres–Lopez*, 111 F.3d at 639, which cites *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir.1979) wherein the Ninth Circuit held "[c]ourts have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act").

Taking that as their starting point, the Plaintiffs focus their argument on the nature of Plaintiffs' work, which they describe as a discrete step in Bebe Stores'

production process, and on Bebe Stores' access to Plaintiffs' payroll records through ARI's monitoring activities, which Plaintiffs say constituted an exercise of indirect control over Plaintiffs' wages and working conditions. (Mot. at 19–25). Plaintiffs assert that a Bebe Stores quality control employee worked for an extended period of time at the Apex El Monte facility and interacted directly with Apex employees regarding the quality of the sewn garments. Plaintiffs also argue that Bebe had complete economic power over Apex because their contracts were not subject to competitive bidding and substantive negotiation. From these factors, Plaintiffs argue that Bebe Stores should be treated as their joint employer.

In contrast, Defendants assert that Plaintiffs urge an "over-simplified interpretation of the Fair Labor Standards Act's" definition of "employer," and "omit[ ] significant facts which the Ninth Circuit considers powerful indicia of the *lack* of joint employment." (Opp. at 2) (emphasis in original). In particular, applying the four *Bonnette* factors, Bebe asserts that it did not: 1) have the power to hire or fire Apex's employees; 2) supervise or control Apex's employees' work schedules or conditions of employment; 3) determine the rate and method of payment of Plaintiffs' wages; or 4) maintain Apex's employment records. (*Id.*). In addition, Bebe argues that other factors considered by the Ninth Circuit preclude a finding of joint employment, distinguishing the case from *Torres–Lopez* and other cases where courts found a joint employment relationship. Bebe Stores emphasizes Apex's independence from Bebe because Apex could reject Bebe's garment orders and negotiate price increases and different turn-around dates, Apex owned its premises and equipment, and Apex marketed its work to other manufacturers. (*Id.*). Bebe also points out that its agent, ARI, did not exercise any control over Plaintiffs: ARI

did not communicate directly with Apex or require that Apex cure any problems it discovered, but simply reported its findings and recommendations to Bebe. (Opp. at 5).

While both sides can find support for their respective position with reference to the factors set forth in the controlling case law, the Court concludes, on balance, that Bebe Stores is not a joint employer with Apex. Critical factors present in this case distinguish it from the situation presented in *Torres–Lopez,* the case on which Plaintiffs so heavily rely.

In *Torres–Lopez,* the grower owned and operated the means of production—the fields and the crops grown on those fields. The grower retained Ag–Labor to obtain the services of field workers to pick the crops. Ag–Labor, which was the nominal employer of those workers, did little other than set up a location at the fields and sign the workers up for the job. As the Court noted:

> At oral argument we learned that Ag–Labor did not actually recruit farmworkers to work at Bear Creek Farms. We also learned that the farmworkers did not form teams of harvesters that moved from farm to farm picking crops. Rather, individual farmworkers would learn by word of mouth that harvesting work was available at Bear Creek Farms. Hoping to be hired, the farmworkers would appear at the field on harvest days. Ag–Labor would then choose farmworkers from this group.

*Torres–Lopez,* 111 F.3d at 637. Thus, Ag–Labor really had no employees at all, but rather worked almost as an employment agent or broker to funnel workers to the grower, which then exercised control over most aspects of the field work. In contrast, Apex has an ongoing business which hires, fires and supervises a significant number of employees who perform ser-

vices for companies other than Bebe Stores.

The *Torres–Lopez* Court also emphasized the importance of focusing on the ownership of the means of production. On that subject, the Court wrote:

[A] grower's ownership of farmland is relevant "for the obvious reason that without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." *Antenor*, 88 F.3d at 937 (citing *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 513–14 (5th Cir.1969)). Similarly, the grower's investment in "equipment and facilities" is probative of the "workers' economic dependence on the person who supplies the equipment or facilities." *Id.* Finally, considering whether the farmworkers perform "a line-job integral to [the grower's] business" is relevant "because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process."

111 F.3d at 640–41. Because Ag–Labor owned nothing, and the grower owned everything, the Court concluded that the agricultural workers who performed the harvest were entirely dependent on the grower for work. This case presents an entirely different situation in which Apex owns its facility and its equipment, and is in a position to contract with clothing manufacturers other than Bebe Stores if it chooses. Thus, unlike Ag–Labor, which provided a service but had no real economic substance, Apex is a going concern with a location, facilities, equipment, employees, supervisors and owners actively involved in the production process.

With respect to control, the Court notes that Bebe Stores did supply personnel whose job was to insure that Bebe Stores received quality goods from Apex, and that at least one of its quality control managers maintained an office at Apex to deal with quality control problems as they arose. But the record falls short of demonstrating that this involvement could be properly characterized as control or supervision over Apex's employees. Apex had its own supervisors who were primarily responsible for the day to day management of its employees, unlike the nominal employer in *Torres–Lopez*. At Apex, these supervisors scheduled work, controlled worker shifts and hours of work, and were responsible for employee assignments. Apex's control over its workers contrasts markedly with the situation described in *Torres–Lopez*. In that case, all decisions regarding when the crop would be harvested, how much would be harvested, how many workers would be employed in the harvest, and the like were controlled by the grower through its representative, Robert May, who was given primary responsibility for the cucumber crop. *Id.* at 642. The *Torres–Lopez* court also noted that the Ag–Labor employee who was involved in supervising the harvesters took direction from the grower's representative. *Id.* These factors definitively distinguish *Torres–Lopez* from the present action, in which, despite the presence of Bebe Stores' quality control personnel at the Apex facility, Apex's supervisors were in control of their own employees.

Finally, the Court concludes that ARI's access to Apex's payroll records, in its capacity as Bebe Stores' monitor of Apex's compliance with labor laws, cannot and should not be equated with Bebe Stores' control, either direct or indirect, over Plaintiffs' payroll records, wages, or working conditions. Department of Labor policy encourages clothing manufacturers to monitor the operations of garment contractors to insure compliance with applicable

labor laws. For example, in Department of Labor OPA Press Release, October 16, 1997 the department announced a policy of encouraging manufacturers who contract with garment shops to "implement[ ] and maintain[ ] an effective monitoring program." In a later survey, described in a 1998 press release, the Department noted, "The 1998 survey...found that effective monitoring of contractor shops increases compliance...." Department of Labor OPA Press Release, May 27, 1998. And later in the same release:

> Clearly, the 1998 survey "confirms that effective monitoring works to significantly improve garment workers' chances of being paid what they are entitled and reduces manufacturers' potential liability for 'hot goods' actions," said Secretary Herman. "We recognize those Los Angeles firms which have been willing to incorporate monitoring, and especially effective monitoring, into the way they do business."

*Id.* This policy—part of the Department's "No Sweat Initiative" arises from legitimate concerns, born from decades of experience, that garment factories often operate what are commonly described as "sweat shops." The Court is aware of no authority for the proposition that Bebe Stores' adoption of monitoring, in response to the Department of Labor initiative, can or should be used to find the existence of a joint employment arrangement. In the Court's view, holding Bebe Stores to have exercised "control" over Apex on the basis of its monitoring activities, and therefore to be a joint employer with Apex, would be counterproductive and would create a disincentive for clothing designers and manufacturers to monitor contractor shops to ensure compliance with the FLSA. Since the Court finds that the test for joint employment has otherwise not been met, it declines to find that Bebe Stores' monitoring of Apex gives rise to joint employer liability.

## IV.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' motion for summary adjudication as to the issue of Bebe's status as a joint employer of Plaintiffs under the FLSA. Moreover, the Court finds as a matter of law that Bebe is not a joint employer of Plaintiffs under the FLSA.

IT IS SO ORDERED.