**Stephane MOREAU, Plaintiff–Appellant,**

v.

**AIR FRANCE; Joseph P. Bouloux;**

**Howard Weisser, Defendants–Appellees,**

v.

**United States of America, Intervenor–Appellee.**

**No. 02–15872.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 2003.

Filed Sept. 15, 2003.

---

Patricia A. Shiu, The Legal Aid Society—Employment Law Center, San Francisco, CA, for the plaintiff-appellant.

M. Elaine Jacoby, Duane Morris, Princeton, NJ, for the defendants-appellees.

Irene Solet, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., for the intervenor-appellee.

Rae T. Vann, McGuiness Norris & Williams, Washington, D.C., for Amicus Curiae Equal Employment Advisory Council.

Elizabeth A. Glidden, Hedin & Goldberg, Minneapolis, MN, for Amicus Curiae National Employment Lawyers Association.

Lloyd Loomis, Sonnenschein Nath & Rosenthal, Los Angeles, CA, for Amicus Curiae International Air Transport Association.

Before HILL,[*] T.G. NELSON, and HAWKINS, Circuit Judges.

---

[*] The Honorable James C. Hill, Senior United States Circuit Judge for the Eleventh Circuit, sitting by designation.

## OPINION

MICHAEL DALY HAWKINS, Circuit Judge.

In this necessarily fact-specific appeal, we must decide whether and in what circumstances contracted service workers should be considered in determining whether an employer is exempt from the requirements of the Family Medical Leave Act ("FMLA") and its California counterpart, the California Family Rights Act ("CFRA"). Air France flies an abbreviated schedule (one flight per day) in and out of the San Francisco International Airport ("SFO"), and contracts with outside entities for ramp and towing service, cargo and baggage handling, and food preparation. If Air France is considered the "joint employer" of the workers performing these services, it is subject to FMLA–CFRA requirements. From an adverse summary judgment concluding Air France was not a joint employer of these workers, Stephane Moreau ("Moreau") appeals.

Air France employed Moreau as its Assistant Station Manager at SFO. In March of 1998, Moreau requested a twelve-week leave of absence to assist his ill father in France, asserting entitlement under the FMLA and CFRA. The request was addressed to Moreau's immediate supervisor, defendant Joseph Bouloux; a copy was forwarded to defendant Howard Weisser, Air France's Director of Personnel, in New York City.

Weisser then had a telephone conversation with Moreau and informed him that the request for leave was denied. Moreau requested a written response, which the company provided, explaining that Air France employed fewer than 50 employees at Moreau's worksite or within a 75–mile

radius, and thus was exempt from the FMLA. Weisser also refuted Moreau's contention that certain ground handling company employees should be counted as "joint employees" of Air France for purposes of the FMLA. The letter also warned that absence from work would lead to termination.

■ Moreau took the leave anyway and was terminated. He then filed suit in district court, claiming his termination violated the FMLA and the CFRA and asserting various state common law claims. The district court determined that Air France should not be considered a joint employer for purposes of the FMLA. In turn, the district court granted summary judgment on Moreau's state law claims for violation of CFRA and wrongful discharge in violation of public policy.[1] The district court also found that Moreau was an at-will employee and granted summary judgment on Moreau's claims for breach of employment contract and breach of the covenant of good faith and fair dealing. Moreau timely appealed.

■ We review a grant of summary judgment de novo. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). The question of whether Air France should be considered a joint employer is a legal question and also reviewed de novo. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983).

## I. Joint Employment under the FMLA

### A. Basic Statutory and Regulatory Framework

The FMLA was enacted, in part, "to balance the demands of the workplace with the needs of families ... in a manner that accommodates the legitimate interests of employers...." 29 U.S.C. § 2601(b). "El-

igible" employees may take a maximum of twelve weeks unpaid leave for the birth of a child or in order to care for a seriously ill spouse, child or parent. *Id.* at § 2612(a)(1).

As part of a compromise in passing the legislation, Congress drafted a "small employer" exception, which excludes employers with fewer than 50 employees. *Id.* at § 2611(4)(A). An additional exception was created for "small operations"—that is, a potentially large company with a relatively small satellite office in a particular area. The statute specifically excludes from coverage an employee who is employed at a particular worksite if the employer has less than 50 employees within 75 miles of that worksite. *Id.* at § 2611(2)(B)(ii). This provision was designed to accommodate employer concerns about "the difficulties that an employer might have in reassigning workers to geographically separate facilities." H.R.Rep. No. 102–135, pt. 1, at 37 (1991). In other words, it might be reasonable to expect an employer to relocate workers from nearby facilities for the period of an FMLA leave (such as reassigning someone temporarily from San Jose to San Francisco), but it would be understandably more difficult to reassign an employee whose family lives in Los Angeles to work in San Francisco for three months.

The FMLA does not contain any language specifically addressing the joint employment concept. Administrative regulations interpreting the FMLA, however, provide some guidance for when a joint employment status *may* be found to exist:

(a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under

---

1. The parties agree that the CFRA is substantively identical to the FMLA, so this opinion addresses only the federal law. *See Mar-*

*chisheck v. San Mateo County*, 199 F.3d 1068, 1073 n. 2 (9th Cir.1999).

FMLA. Joint employers may be separate and distinct entities with separate owners, managers and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between employers to share an employee's services or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

(b) A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality. For example, joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.

29 C.F.R. § 825.106(a) & (b).

The regulations distinguish between the "primary employer" and "secondary employer":

In joint employment relationships, only the primary employer is responsible for giving required notices to its employees, providing FMLA leave, and maintenance of health benefits. Factors considered in determining which is the "primary" employer include authority/responsibility to hire and fire, assign/place the em-

ployee, make payroll and provide employment benefits.

*Id.* at § 825.106(c). If a joint employment relationship is found to exist, "[e]mployees jointly employed by two employers must be counted by both employers, whether or not maintained on one of the employer's payroll, in determining employer coverage and employee eligibility." 29 C.F.R. § 825.106(d).

### B. Joint Employment Caselaw

There are no reported cases in this circuit (or any other, for that matter) addressing joint employment in the FMLA context. There are, however, reported joint employer cases arising under the Fair Labor Standards Act ("FLSA") and the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") that are informative. In fact, the FMLA employs a number of definitions from the FLSA, 29 U.S.C. § 2611(3), and the FMLA joint employer regulation mirrors the wording of the FLSA joint employment regulations. *Compare* 29 C.F.R. § 825.106 *with* 29 C.F.R. § 791.2(b).

#### 1. *Bonnette* and *Torres–Lopez*

In a FLSA case, *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465 (9th Cir.1983), we noted that the joint employment determination required consideration of the total employment situation, but focused primarily on four factors: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 1470.

Applying these factors, we concluded that California state and county welfare agencies were joint employers of "chore workers" who provided domestic in-home

services to the aged, blind and disabled. *Id.* A state program provided funding for the home services and, although the recipient was able to select the chore worker, the county determined the tasks to be performed, the number of hours per week required for those tasks, and verified the hours worked before disbursing payment. *Id.* at 1468. We explained that the agencies had "complete economic control" over the employment relationship and the "economic reality" was that the agency employed the chore workers to perform services for the benefit of the recipients. *Id.* at 1470. The district court's decision in this case focused on the four *Bonnette* factors.

■ More recently, we considered joint employment under the AWPA.[2] *Torres–Lopez v. May,* 111 F.3d 633 (9th Cir.1997). There, a cucumber grower contracted with Ag–Labor Services, a farm labor contractor, to supply laborers and supervise the harvesting of a cucumber crop. *Id.* at 637. Ag–Labor did not have a ready workforce and did not recruit farm-workers, but chose its workers from a group that would appear at the farm on harvest days. *Id.* The cucumber grower's representative established the harvest schedule and closely monitored the picking of the plants. *Id.* at 638. The grower also made a considerable financial investment in raising the cucumbers and provided most of the significant harvesting equipment, save some simple, hand-held tools. *Id.* at 643–44.

In *Torres–Lopez,* we followed *Bonnette's* direction to consider all factors "relevant to the particular situation" in evaluating the "economic reality" of an alleged joint employment relationship. 111 F.3d at 639 (quoting *Bonnette,* 704 F.2d at 1470). We considered a non-exhaustive list of factors

set forth in the AWPA regulations, including:

(A) The nature and degree of control of the workers;

(B) The degree of supervision, direct or indirect, of the work;

(C) The power to determine the pay rates of the methods of payment of the workers;

(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and

(E) Preparation of payroll and the payment of wages.

29 C.F.R. § 500.20(h)(4)(ii). We also identified a number of "non-regulatory" factors that may be relevant to deciding whether a joint employment relationship exists:

(1) whether the work was a specialty job on the production line;

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

(3) whether the premises and equipment of the employer are used for the work;

(4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;

(5) whether the work was piecework and not work that required initiative, judgment or foresight;

(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

(7) whether there was permanence in the working relationship; and

---

2. The AWPA also relates to the FLSA, as "employ" has the same meaning under both statutes and the AWPA regulations provide

that " 'joint employment' under the [FLSA] is 'joint employment' under the [AWPA]." 29 C.F.R. § 500.20(h)(4).

(8) whether the service rendered is an integral part of the alleged employer's business.

*Id.* (internal citations and quotations omitted).

Based on a review of all these factors, *Torres–Lopez* concluded that the grower should be considered a joint employer with the labor contractor, because the grower exercised considerable control over the farmworkers and the farmworkers were "economically dependent" on the grower for their work. *Id.* at 644.

### 2. *Zhao v. Bebe Stores*

A recent FLSA decision, *Zhao v. Bebe Stores, Inc.,* 247 F.Supp.2d 1154 (C.D.Cal. 2003), is also instructive. Apex Clothing Corporation sews garments for clothing manufacturers including Bebe Stores, Inc., with whom it does the majority of its business. *Id.* at 1155. Several of Apex's garment sewers sew exclusively for Bebe. Apex owns and operates its own production facility, has sole control over hiring, firing and the working conditions of its employees, and it contracts with other stores besides Bebe. *Id.* Bebe does, however, have quality control personnel who inspect garments at Apex, and Bebe also contracts with Apparel Resources, Inc. to audit Apex and Bebe's various other manufacturers in order to ensure the manufacturers are complying with state and federal labor laws. *Id.* at 1156.

Employing the *Bonnette* and *Torres–Lopez* tests, the district court held that although some factors tipped in the plaintiffs' favor, on balance Bebe should not be treated as a joint employer of the garment sewers. It noted that the *Bonnette* factors all weighed against finding joint employment, and distinguished its facts from *Torres–Lopez. Id.* at 1159. The court stressed that Apex owns its own facility and equipment, is in a position to contract with other clothing manufacturers, and is not economically dependent on Bebe in the same way the farmworkers were dependent on the grower in *Torres–Lopez. Id.* at 1160. The court also contrasted the "quality control" of the garment workers from the near complete control over the harvest in *Torres–Lopez.* The court pointed out that in *Torres–Lopez,* the labor contractor really had no employees, but worked like a broker to funnel workers to the grower, who then exercised control over most aspects of the field work. *Id.* at 1159–60. In contrast, the court noted that "Apex has an ongoing business which hires, fires and supervises a significant number of employees who perform services for companies other than Bebe Stores." *Id.* It also found that monitoring compliance with labor laws to avoid "sweat shops" was not exercising "control" over Apex, and noted that such a holding would be "counterproductive and create a disincentive" for clothing designers to monitor their contractor's compliance with federal law.[3]

### C. Facts

With this legal framework in mind, we now turn to the facts of this case. Moreau contends that Air France should be considered as a joint employer of the employees

---

3. In a somewhat similar circumstance involving the garment manufacturing business, a court in the Southern District of New York found that a joint employment relationship existed between the manufacturer and sewer. *Lopez v. Silverman,* 14 F.Supp.2d 405 (S.D.N.Y.1998). In *Lopez,* however, there was a close familial relationship between the owner of the sewer business and the manufacturer's production manager; the manufacturer was also willing to absorb losses and pay for sub-standard work, which was more customary of in-house production. *Id.* at 422–423. Thus, the court found these special circumstances indicated a "symbiosis" between the companies. *Id.* at 423.

of three different ground handling service companies.

### 1. Dynair/Swissport

Air France contracted with Dynair (which later changed its name to Swissport) to provide ground handling services at SFO, such as ramp and towing service, baggage handling, and aircraft cleaning. Dynair did not service Air France exclusively, and its employees would rotate from plane to plane and carrier to carrier so as to fill up an entire workday. Dynair charged Air France based on the type of aircraft involved, though Air France would occasionally reimburse the handling company for extra help if requested or approved. If a flight was delayed beyond a one-hour grace period, Air France was subject to additional charges for Dynair's employees' time. A Dynair executive explained that this arrangement was needed because Dynair scheduled its employees to service a number of carriers, and if one carrier was running significantly behind, the delay could present a substantial problem for Dynair in meeting the demands of its other customers.

Dynair owned all its own equipment, with the exception of the pallets which held the luggage that were actually loaded onto the airplane. Dynair would decide how many employees were needed to service a particular flight. With the exception of cleaning the airplanes, most services were provided on the tarmac, not on Air France property. Dynair employees were on the Air France aircraft approximately 30 minutes a day. Air France was not responsible for hiring, firing, disciplining or paying Dynair employees. Dynair employees received no benefits from Air France.[4]

Air France provided very specific information about how to clean its planes, and Air France employees checked the planes after cleaning, communicating any problems to the Dynair supervisor. Air France also provided detailed information about how its aircraft should be loaded. Air France required that at least one Dynair employee be "C2" certified, that is, trained in load control and maintaining the proper weight and balance of the baggage and cargo loaded onto the aircraft. Dynair generally trained its own employees, but if a trainer was not available, sometimes Air France conducted the "C2" training. As with the cleaning crew, Air France had an employee monitor the loading of baggage and communicate problems to the Dynair supervisor.

### 2. Ogden/SkyChefs

Air France contracted with Ogden (later acquired by Sky–Chefs) to provide catering services for its return flight to France. Air France had a master chef who would prepare a menu for Air France flights. Air France communicated this menu to Ogden, along with information about the number of passengers, special meal requests, etc. Ogden owned all its own kitchen equipment. It purchased and prepared all the food in its kitchen, although Air France supplied some specialty items, such as cheese and caviar. Ogden loaded the food onto Air France trays and carts, which were transported to and loaded onto the plane.

Ogden employees might have spent 45 minutes a day on the Air France aircraft; the rest of the time they were at the Ogden facility or in transit. Ogden serviced other carriers at the same time it provided service to Air France. Air

---

4. Although a Dynair manager did receive a free ticket to France once as a gift, Dynair employees were not routinely given the free flight benefits that other Air France employees enjoyed.

France paid Ogden based on the number of meals and other services provided, regardless of the number of employees servicing Air France or the number of hours those employees worked.

An Air France employee who was responsible for the airline's catering occupied a small office in the Ogden kitchen, received information from Air France and transmitted it to the caterer. This Air France employee also performed quality checks on the food, such as random taste tests, and sent meals to Air France headquarters once a week to check for bacteria. Any problems with food quality were communicated to the Ogden supervisor, usually at a monthly meeting. Air France had no control over hiring, firing, disciplining or scheduling of Ogden employees, other than indicating at what time the meals needed to be ready to load onto the plane.

Air France terminated its relationship with Ogden (then SkyChefs) in 2000. A SkyChef supervisor testified there was no change in the number of employees he supervised after Air France stopped using its catering services.

### 3. Aeroground

Air France contracted with Aeroground for cargo handling services. Aeroground was paid primarily based on the amount of cargo it handled, and not for specific employee time. Aeroground serviced a number of carriers, and many of its employees were "cross-utilized" as needed to serve the needs of its different clients. The contract required Aeroground to "dedicate" a certain number of employees to work exclusively for Air France, including one dedicated supervisor, two customer service agents, and five warehouse personnel. Aeroground had discretion, however, in scheduling these employees and could transfer them from one client account to

another, so long as the appropriate minimum number of employees were assigned to service Air France. These employees were a small fraction of Aeroground employees at the San Francisco location.[5]

Air France also required a minimum number of "cross-utilized" warehouse employees—i.e., employees who did not work exclusively on the Air France account. If additional employees were required to perform the work (above and beyond the contractually specified dedicated and cross-utilized employees), Aeroground was obligated to provide however many employees were necessary to fulfill its duties, but there was no additional payment for the services.

Aeroground owned and supplied all equipment necessary for cargo handling, such as forklifts, scales and pallet jacks. Aeroground also provided its own warehouse and office space. Aeroground had responsibility for hiring, firing, promoting, and disciplining employees. Air France provided some training to Aeroground employees on the Air France computer system and other training to ensure compliance with applicable safety regulations in the United States and France, if the employees had not already received such training. There was heavy turnover of Aeroground employees, especially warehouse personnel. There were also three changes in Aeroground supervisors during its contractual relationship with Air France.

One Air France employee, Marc Richard, worked full time at the Aeroground cargo facility as the Air France Cargo Operations Manager. He was responsible for assuring the quality of services provided by Aeroground, and interacted with the Aeroground supervisor if problems arose,

---

**5.** One Aeroground employee indicated there were between 50–70 Aeroground warehouse workers at the warehouse which serviced Air France.

usually at a monthly meeting with the supervisor. When asked if monitoring quality of service meant supervising Aeroground employees, Richard initially responded "that's right", but then went on to qualify his statement:

> I would say supervise what they do is different. I'm not a crusader after people. I check what they do. It's a different story. I don't monitor their schedule. I don't monitor if they are sick or on vacation. This is done by their supervisor. I just want to make sure that my operation is covered.

### D. Application

#### 1. *Torres–Lopez* and *Bonnette*

■ Moreau would have us analogize Air France to the *Torres–Lopez* farm owners and the ground handling service companies to the farm's labor contractors. *See Torres–Lopez*, 111 F.3d at 642–644. He argues that the district court erred by applying only the four-factor test from *Bonnette,* and argues that it should have employed the more expansive considerations from *Torres–Lopez*. He contends that the *Bonnette* considerations are overly restrictive in the FMLA joint employer context, as an "indirect" or "secondary" employer will almost never satisfy these criteria, which are more the responsibilities of the "primary" employer. *See* 29 C.F.R. § 825.106(c). While this may be true, Air France is correct that even if we apply the expanded *Torres–Lopez* test, the totality of the circumstances and the "economic reality" of the situation still leave us with the conclusion that Air France should not be considered a joint employer.

We begin by considering the *Bonnette* factors, which roughly correspond to the *Torres–Lopez* "regulatory factors." *Bon-*

*nette,* 704 F.2d at 1470; *Torres–Lopez,* 111 F.3d at 642. Air France lacked the ability to hire or fire ground handling company employees, it did not determine the rate or method of pay for these employees, and it did not keep employment records for these employees. It did not set or control the employees' work schedules,[6] working conditions, or establish conditions upon which the employees would receive payment.

There is no indication that Air France had the authority to "control" any of the workers, but would instead communicate any complaints about performance to the service company's supervisors. Moreau suggests that Air France "controlled" the work by being very specific about what work it wanted performed, such as by providing a detailed checklist of what to clean on the airplane or a load sheet illustrating how baggage should be loaded on a given flight. Moreau does not point to any decision that correlates specific instructions to a service provider with "control" over the service companies' employees or their working conditions. We also note that it would be a foolish business practice to contract with a company to perform a service, but provide it with little or no guidance on exactly what services are to be performed.

Air France did, however, check to ensure that its standards were met and that the service provider's overall performance adhered to Air France's specifications. This type of activity can, in some situations, constitute "indirect" supervision of the employees' performance. *See Torres–Lopez*, 111 F.3d at 642–43. It is, however, noteworthy that in this case, much of the indirect supervision or control exercised by Air France over the ground handling

---

6. Air France did, of course, schedule its flight into and out of SFO, which necessarily indicated when the services were to be performed. The individual companies, however, remained responsible for designating which employees would report to service the aircraft.

employees was purportedly to ensure compliance with various safety and security regulations, such as ensuring that food equipment was properly stowed or that the plane's load was adequately balanced. Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly. As the court noted in *Zhao,* it could be counterproductive to equate ensuring lawful compliance with "control" or supervision of employees. 247 F.Supp.2d at 1161. We therefore believe that the purported control or supervision alleged by Moreau in this case is qualitatively different from the farmworker situation in *Torres–Lopez,* and is certainly not enough to tip the scale in Moreau's favor when considered in context.

Turning to the non-regulatory factors of *Torres–Lopez,* they also generally counsel against finding Air France to be a joint employer. 111 F.3d at 643–44. The service contracts were negotiated and quite specific; there is no indication they could simply be passed on to another contractor. The service work was primarily performed on the premises of the ground handling companies or the airport tarmac, with some minimal (and obviously essential) contact with the Air France airplane during loading or cleaning, which usually consisted of only 30 to 45 minutes of work. *Cf. id.* at 643.

The ground companies also invested significant capital in expensive equipment such as forklifts, kitchen equipment, and so forth. This is in stark contrast to the farmworker situation in *Torres–Lopez,* in which the grower owned or leased the land on which the work was performed and supplied the expensive farm equipment, with the exception of simple, hand-held tools. *Id.* at 643–44. Although Air France provided some equipment, such as the food trays and baggage pallets, this equipment was minimal in comparison to the large kitchen equipment or heavy cargo loading equipment found on the ground. It is also obvious why the ground companies would not provide these items, which would be transported to a foreign country and out of the ground companies' control.

Unlike the farmworkers, the ground handling employees *did* have a business organization that could and did shift as a unit from one carrier to another. *Cf. id.* at 644. All of the ground handling companies serviced multiple carriers; many of the individual employees worked for multiple carriers in a given work day. The Sky-Chef employees were even unionized.

The skill level required of the workers varied widely depending on the job performed, and thus it is not clear that this factor cuts either way. *Cf. id.* Obviously, the position of master chef requires more skill than the position of a baggage handler, but even baggage handlers required some specialized training. In addition, and in contrast to the farm laborers, the ground company employees did have an opportunity for profit or promotion based on their managerial skill, and such promotions occurred within the ground handling companies, and not Air France. *Cf. id.*

The longevity of the working relationship varied from company to company and employee to employee. *Cf. id.* It appears that the same chef worked on the Air France account for some time; the Aeroground warehouse employees, however, turned over rather frequently. This factor does not weigh heavily in either direction.

The remaining *Torres–Lopez* considerations focus on whether the work was an integral part of the alleged employer's business. *Id.* at 643–44. We question whether or not this factor translates well outside of the production line employment situation; we also doubt that many of the

functions, such as food service or cargo transport, are actually "integral" to a passenger airline. But even if we accept Moreau's characterization of the various services as essential to the airline, this factor (even if coupled with Air France's "indirect" supervision of employees) does not outweigh the numerous significant factors discussed above, which weigh heavily against finding a joint employer relationship.

### 2. Additional considerations

As directed by the FMLA regulations, we must consider the totality of the circumstances and all relevant factors. 29 C.F.R. § 825.106(6). In this case, there are some additional facts that are not adequately considered in the foregoing *Bonnette* or *Torres–Lopez* analysis, but which do not alter the outcome in this case. One involves the use of shared premises with the ground handling companies. The factual specifics vary based on the relevant ground handling company.

Dynair subleased space at SFO from Air France until the airport authority changed its rules and permitted ground companies to lease directly from the authority. The deposition testimony indicates that this sublease was at the prevailing rental rate plus 15%, and thus is not an indication of any special relationship between the two companies or of Dynair's "economic dependence" on Air France.

Ogden also provided a small (approximately 60 square foot) office to Air France in their kitchen facility "free of charge." A declaration from an Ogden employee, however, indicates that this was customary for its foreign carrier clients and that the cost of the space was covered by the meal and other service charges billed to Air France.

Aeroground provided Air France with 2,500 square feet of office space "free of charge" and the Air France logo appeared on the exterior of the Aeroground building. As with the Ogden arrangement, the office space was part of the contract, and although there was not a separate charge for this space in the contract, it was obviously a negotiated point which was factored into the economics of the deal in some respect.[7]

Moreau also argues that it is significant that Air France would essentially "reimburse" Dynair if its employees had to work overtime or extra time because the Air France flight arrived late. Under the contract, Dynair charged Air France a flat rate based on the type of aircraft serviced; there was also a one-hour grace period. If service was required beyond the one-hour grace period, Air France was subject to extra charges based on the number of employees Dynair held over and what Dynair had to pay the employees to keep them waiting around for the Air France aircraft. Because the primary payment arrangement did not vary based on the number of employees or the time involved and because Air France did not set the rate of pay for the Dynair employees, this factor does not alter the result. If anything, this pay arrangement actually stems from Dynair's need to service other customers, and reflects an "economic reality" that Dynair and its employees were not economically dependent on Air France.

### E. Conclusion

While the district court's focus on the four *Bonnette* factors appears a bit narrow in the circumstances of this case, considering the entire relationship in its totality, 29 C.F.R. § 825.106, we conclude that Air France should not be treated as a joint

---

**7.** Moreover, it is not indicative of a special relationship between the two companies, as the record suggests there was a similar arrangement between Aeroground and Asiana airlines for space in the same building.

employer of the ground handling service company employees. We therefore affirm the district court's grant of summary judgment to Air France on Moreau's FMLA and CFRA claims.[8]

## II. Common Law Claims

### A. Public Policy

■ Moreau also alleges that his termination violated California public policy. However, the only public policy implicated is that embodied in the CFRA and the FMLA. California law provides no common law remedy to those who are not entitled to coverage under the statute evincing the public policy. *Jennings v. Marralle*, 8 Cal.4th 121, 135, 32 Cal.Rptr.2d 275, 876 P.2d 1074 (1994). The district court properly concluded that Air France should not be considered a joint employer. Moreau, therefore, is not an eligible employee under the FMLA and has no corresponding public policy claim under state law.

### B. Breach of Contract

Moreau also contends that Air France breached an implied-in-fact contract that his employment could only be terminated for cause, as opposed to at-will. California looks at various factors to determine whether an employer intended employment to be at-will, including "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment and the practices of the industry in which the employee is engaged." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373 (1988). Mor-

eau was an employee of Air France for nearly eleven years and received merit raises, promotions, and favorable performance evaluations. However, longevity, raises and promotions without specific words or conduct by the employer negating at-will employment, will not suffice to raise a triable issue of fact. *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 338, 341–42 (2000).

In this case, the Air France employee handbook contains a prominent disclaimer that employment is at-will. This is significant, but not dispositive. *See id.* at 339. The manual also list examples of discipline problems which can result in immediate dismissal, and, for other infractions, describes a progressive disciplinary policy of warnings, suspension without pay and dismissal. There is also an employee grievance procedure giving employees the right to discuss problems or suggestions related to "classification, seniority, promotion, overtime, vacation, holidays, supervision, working conditions, or any matter that may be of concern to you." The manual specifies that there is a six-month "probationary period," during which an employee may be terminated without following the disciplinary procedure or the grievance procedure.

Contrary to the district court's conclusion, under California law this may suffice to raise a triable issue of fact regarding the existence of an implied-in-fact contract to terminate for good cause. *See id.* at 338. In *Guz*, the California Supreme Court held that a company's written personnel documents, which implemented a progressive discipline system, raised a triable issue

---

**8.** Moreau's additional contention that triable issues of fact remain regarding the number of employees at the time of his request is without merit. Air France's payroll records were properly authenticated by their custodian, and the district court properly indulged every inference in start or termination dates in fa-

vor of Moreau, still yielding only a maximum of 42 employees at the time of Moreau's leave request. 29 C.F.R. § 825.110(f)("Whether 50 employees are employed within 75 miles to ascertain an employee's eligibility for FMLA benefits is determined when the employee gives notice of the need for leave.").

whether that company had implied contractual limits on the circumstances under which employees would be terminated, notwithstanding an express disclaimer that employment was at-will. *Id.; see also id.* at 344, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ("When an employer promulgates formal personnel policies and procedures in handbooks, manuals and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their employment.").

■ Even if the handbook created an implied contract of "for cause" termination, however, the grant of summary judgment to Air France was still appropriate. To succeed on his claim, Moreau had to prove not only that there was an implied-in-fact contract, but also that Air France breached that agreement. *See Guz,* 24 Cal.4th at 346–47, 100 Cal.Rptr.2d 352, 8 P.3d 1089. The employee handbook indicates that either "insubordination" or "absences without justification" is "sufficient cause for *immediate* dismissal." (emphasis added). An unexcused absence is specifically *not* subject to the progressive discipline system described in the handbook. As Air France argued in its motion for summary judgment, even if there were an implied contract to terminate only for good cause under certain circumstances, Air France did not breach that agreement because Moreau's actions (failure to return to work and insubordination) fell within the listed circumstances. We therefore affirm the district court's grant of summary judgment on this claim as well.

**C. Breach of Implied Covenant of Good Faith and Fair Dealing**

■ Moreau's claim for breach of the covenant of good faith and fair dealing also fails. *See Guz,* 24 Cal.4th at 349–352, 100 Cal.Rptr.2d 352, 8 P.3d 1089. This implied covenant cannot "impose any substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* at 350, 100 Cal.Rptr.2d 352, 8 P.3d 1089. Because Air France did not breach the terms of its implied-in-fact agreement with Moreau, the implied good faith covenant cannot expand Moreau's rights, and summary judgment on this claim was also proper.[9]

## CONCLUSION

Looking at the totality of the circumstances and the "economic reality" of the relationship between Air France and the various ground handling companies and their employees, the district court correctly concluded that Air France should not be considered a joint employer of these employees for FMLA purposes and properly granted summary judgment to Air France. From this conclusion, it follows that the district court also correctly granted summary judgment on Moreau's state law claims for violation of CFRA and wrongful termination in violation of public policy.

Although the Air France handbook may have raised a triable issue of fact regarding the at-will nature of Moreau's employment under California law, we nonetheless affirm the district court's grant of summary judgment on Moreau's breach of contract claim. Even if an implied contract

9. Because we affirm the district court's grant of summary judgment on the FMLA, CFRA, and state law claims, we do not reach the additional questions of whether the Federal Sovereign Immunities Act precludes a jury trial against the individual defendants who are United States citizens or whether the dis-

trict court had personal jurisdiction over defendant Howard Weisser. We also deny as moot the Motion of Appellees Air France and Bouloux to Strike Appellant's Statements of Facts Unsupported in the Record, and Appellant's First and Second Requests for Judicial Notice.

existed, Moreau's failure to return to work was an "absence without justification" which permitted Air France to terminate him immediately.

AFFIRMED.