Sabas ARREDONDO, et al., Plaintiffs,

v.

DELANO FARMS COMPANY, Cal–Pacific Farm Management, L.P., and T & R Bangi's Agricultural Services, Inc., Defendants.

No. CIV. 1:09–01247 WBS SAB.

United States District Court, E.D. California.

Feb. 5, 2013.

---

Gregory Ramirez, James Engel Perero, Myers, Widders, Gibson, Jones & Feingold, LLP, Jessica Arciniega, Wasserman, Comden & Casselman, Ventura, CA, William Cooper Callaham, Wilcoxen Callaham, Sacramento, CA, Katherine Winder, Murchison & Cumming LLC, Los Angeles, CA, Marcos Rodrigo Camacho, Marcos Camacho, A Law Corporation, Bakersfield, CA, Melissa Meeker Harnett, Wasserman, Comden, Casselman & Esensten, L.L.P., Tarzana, CA, for Plaintiffs.

Ryan Solomon, PHV, Cynthia A. Stross, PHV, David N. Bruce, PHV, James P. Savitt, PHV, Miles A. Yanick, PHV, Sarah Gohmann Bigelow, PHV, Savitt Bruce & Willey LLP, Seattle, WA, William C. Hahesy, Law Offices of William C. Hahesy, Howard A. Sagaser, Atkinson, Andelson, Loya, Ruud & Romo, Fresno, CA, for Defendants.

### MEMORANDUM OF DECISION

WILLIAM B. SHUBB, District Judge.

Plaintiffs are a certified class of field workers employed by farm labor contractors T & R Bangi's Agricultural Services ("T & R Bangi") and Cal–Pacific Farms ("Cal–Pacific"), who performed work for defendant Delano Farms Company ("Delano Farms") during the period from 2005 to 2009. On January 15, 2013 through January 30, 2013, the court conducted a seven-day bench trial on the limited issue of whether during the relevant time frame Delano Farms employed plaintiffs under the Migrant Seasonal Agricultural Workers Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq.*, and under applicable California law.

For the reasons discussed in detail below, the court concludes that T & R Bangi and Cal–Pacific were independent contractors, but that Delano Farms was a joint employer of plaintiffs under both the AWPA and the applicable California law. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I.  *Factual and Procedural Background*

Delano Farms is a grower of table grapes that has been in operation for more than nineteen years. It owns approximately 6,300 acres of non-contiguous vineyards in Central California. Delano Farms has structured its business to be streamlined and lean. As a result, Delano Farms contracts for many of its farming functions, such as pre-harvest field work, picking and packing the grapes during harvest, and moving the packed grapes from the fields to the cold storage facility—also called "swamping." The primary field tasks performed in-house are fertilizing the crops, preparing the fields for planting, and irrigating the plants. The core of the Delano Farms management team consists of Joe Campbell, Jack Campbell, and Scott Quashnick.

T & R Bangi and Cal–Pacific are farm labor contractors who specialize in providing field employees to grape growers. T & R Bangi is a corporation whose shares are divided equally between two brothers, Terry and Teddy Bangi. T & R Bangi provided field labor services to Delano

Farms since Delano Farms' inception around 1992 until 2004.

In 2004, Cal–Pacific, a limited partnership, was formed. Craig Neville, an administrative employee from T & R Bangi, was the general partner of Cal–Pacific, and the Bangis' wives were the two limited partners. Cal–Pacific was formed when the liability insurance rates for T & R Bangi's field labor services increased. (Tr. 161:12–21.) Terry and Teddy Bangi continued to control the operations of Cal–Pacific, and the organizational structure remained unchanged. After Cal–Pacific was formed, T & R Bangi stopped providing field labor services to farms.[1]

Cal–Pacific provided field labor services to Delano Farms from 2004 to 2009. In 2009, once T & R Bangi could procure liability insurance at a lower rate, Cal–Pacific ceased operations, and T & R Bangi once again began providing services to Delano Farms. T & R Bangi provided farm labor services to Delano Farms until approximately 2012. Kern Ag Labor Management, Inc., an organization formed by Terry Bangi without his brother, currently provides field labor services to Delano Farms. Because of the close ties between T & R Bangi and Cal–Pacific, the court will refer to them together as "Contractor" unless it is necessary to do otherwise.

Contractor provided several thousand farm laborers to Delano Farms. (Tr. 86:4–5.) Pre-harvest services include pruning, suckering,[2] tipping,[3] girdling,[4] and tying.[5] During harvest, the workers would typically work in teams of three. Two workers would pick the grapes and deliver them to tables at the end of a crop row, where a packer would pack the grapes into boxes, trays, or clamshells, depending on the final destination of the grapes. (Tr. 335:9–13.) A foreman would supervise a crew, which consisted of many teams and approximately 60 people. (Tr. 333:10–21.) Foremen would then report to a supervisor. Supervisors would report to Contractor management, including Craig Neville, an administrative employee, or Terry Bangi. There were approximately ten supervisors working for Contractor. The total number of workers, including supervisors, would vary during the year depending on how much work Contractor was performing.

In 2009, the named plaintiffs brought suit against Contractor and Delano Farms for wage and hour violations under both the AWPA (29 U.S.C. § 1801 et seq.) and California law, including Wage Order 14 (8 Cal.Code Reg. § 11140) and the California Labor Code.[6] (Docket No. 2.) The class was certified on April 19, 2011. (Docket No. 85). Delano Farms brought a motion for summary judgment, arguing that it did not employ plaintiffs under either federal or California law, but the motion was denied. (Docket No. 165). Delano Farms then moved to bifurcate the trial. (Docket

1. T & R Bangi continued to provide laborers in Delano Farms' cold storage facility during this time.

2. Suckering is removing the unnecessary sprouts forming on the plaint. (Tr. 208:17–21.)

3. Tipping is "dropping bunches" to increase the quality of the fruit. (Tr. 209:19–21.)

4. Girdling is cutting a notch around the vine to stress the vine, which increases grape size and gives them better color. (Tr. 209:11–14.)

5. Tying involves tying plant canes to wire "so the fruit can hang down." (Tr. 209:24–210:3.)

6. Specifically, plaintiffs allege wage and hour violations under California Labor Code sections 1194(a), 2802, 226, and 203. Plaintiffs also bring a claim for unfair competition under California Business and Professions Code section 17200. (Docket No. 2.)

No. 169.) The court ordered that the issue of whether Delano Farms employed plaintiffs should be tried separately by bench trial. (Docket No. 175.) The bench trial began on January 15, 2013 and ended on January 30, 2013.

## II. *Analysis*

### A. *Employment under the AWPA*

■ Under the AWPA, the term "agricultural employer" means "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, *employs,* furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2) (emphasis added). The term "employ" for the purposes of the AWPA has the same meaning as Section 3(g) of the Fair Labor Standards Act ("FLSA"). *Id.* § 1802(5). The FLSA defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). The ultimate question of whether a defendant is an "employer" is a legal question. *See Bonnette v. Ca. Health & Welfare Agency,* 704 F.2d 1465, 1468 (9th Cir.1983).

The Ninth Circuit has noted that "[c]ourts have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act." *Real v. Driscoll Strawberry Asscs., Inc.,* 603 F.2d 748, 754 (9th Cir. 1979). Congress passed the AWPA to correct the narrow definition of "farm labor contractor" under the Farm Labor Contractor Registration Act, and the expansive definitions under the FLSA should be applied to the AWPA as well. *See Torres–Lopez v. May,* 111 F.3d 633, 639 (9th Cir. 1997).

Under regulations passed pursuant to the AWPA, "[t]he definition of the term 'employ' may include consideration of whether or not an independent contractor relationship exists under the Fair Labor Standards Act." 29 C.F.R. § 500.20(h)(4). "If it is determined that the farm labor contractor is an employee of the agricultural employer/association, the agricultural workers in the farm labor contractor's crew are deemed to be employees of the agricultural employee/association ...." *Id.*

If, on the other hand, a farm labor contractor is found to be a bona fide independent contractor, the court must still analyze "whether or not the employees of the farm labor contractor are also jointly employed by the agricultural employer/association." *Id.* § 500.20(h)(5)(i).

### 1. *Independent Contractor or Employee*

"In determining if the farm labor contractor ... is an employee or an independent contractor, the ultimate question is the economic reality of the relationship—whether there is economic dependence upon the agricultural employer/association or farm labor contractor, as appropriate." *Id.* § 500.20(h)(4); *see Real,* 603 F.2d at 755–56 (holding that when distinguishing employees from independent contractors the test must focus on the economic realities of the total circumstances). In making this determination, courts are to consider all circumstances, including the following:

(i) The nature and degree of the putative employer's control as to the manner in which the work is performed;

(ii) The putative employee's opportunity for profit or loss depending upon his/her managerial skill;

(iii) The putative employee's investment in equipment or materials required for the task, or the putative employee's employment of other workers;

(iv) Whether the services rendered by the putative employee require special skill;

(v) The degree of permanency and duration of the working relationship;

(vi) The extent to which the services rendered by the putative employee are an integral part of the putative employer's business.

29 C.F.R. § 500.20(h)(4).

"Neither the presence nor absence of any individual factor is determinative." *Donovan v. Sureway Cleaners,* 656 F.2d 1368, 1370 (9th Cir.1981). While these factors are helpful to the courts in determining the economic reality between the parties, the analysis is "not a mechanical determination." *Bonnette,* 704 F.2d at 1470. The factors "provide a useful framework for analysis," but are not "etched in stone and will not be blindly applied." *Id.* The relationship between the parties "is not determined by a mathematical formula," and "[t]he purpose of weighing the factors is not to place each in either the contractor or grower's column, but to view them qualitatively to assess the evidence of economic dependence, which may point to both." *Antenor v. D & S Farms,* 88 F.3d 925, 933 (11th Cir.1996). Ultimately, the "determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947).

### a. *Delano Farms' Control Over the Work*

In *Real,* the court analyzed the relationship between Driscoll Strawberry Associates ("D.S.A."), Donald Driscoll, and sublicensee growers. *Real,* 603 F.2d at 750–51. Driscoll provided patented strawberries to Driscoll, who in turn granted sublicensees the right to grow the crop on a parcel of land, usually about three acres. *Id.* The court found that economic realities between the parties did not indicate an independent contractor relationship when, among other things, D.S.A. had the power to reject Driscoll's choices of sublicensees, "determine the quantity and variety of the strawberry plants grown by [the sublicensees]," and control "certain important decisions in growing the strawberries, including the spacing of the plants, when and how much fertilizer is to be applied, and the timing and type of spraying for insects." *Real,* 603 F.2d at 756. In addition, D.S.A. inspectors directly supervised the sorting and grading of the strawberries at harvest. *Id.*

In *Torres–Lopez v. May,*[7] the Ninth Circuit rejected a district court's finding that a grower did not exercise control when the grower "only gave general instructions to [the farm labor contractor] as to when to begin harvesting and what fields to harvest." *Torres–Lopez,* 111 F.3d at 642. Rather, the court found that the grower "in fact did exercise significant control" when it "controlled the harvest schedule and the number of workers needed by staggering the planting dates of the [crop]," "advised [the farm labor contractor] about when to begin harvest," and "had the power to decide which days were suitable for harvesting; for example, it called off the harvest one day because of a shortage of bins." *Id.* at 642. *But see Martinez–Mendoza v. Champion Intern. Corp.,* 340 F.3d 1200, 1211 (11th Cir.2003) (noting that "the drafting of planting specifications is unquestionably an agricultural decision which does not constitute the type of 'control' that the FLSA and [AWPA] address"). The grower also "exercised a substantial degree of supervision over the work performed by the farmworkers" be-

---

**7.** The court recognizes that in *Torres–Lopez,* the Ninth Circuit discussed control in the joint employment context, rather than in the bona fide independent contractor analysis at issue here. *See Torres–Lopez,* 111 F.3d at 637. Nevertheless, the court believes that the discussion in *Torres–Lopez* and other joint-employment cases are instructive on the issue of control for the independent contractor analysis.

cause it "had the right to inspect all the work performed by the farmworkers, both while it was being done and after the [crop] was picked," one of the grower's supervisor's "daily presence in the field helped ensure that the farmworkers performed satisfactorily," and the farm labor contractor "communicated three to four times a week with [the grower's supervisor] to ensure that [he] was satisfied." *Id.* at 642–43. As characterized by a later Ninth Circuit case, the "grower's representative established the harvest schedule and closely monitored the picking of the plants." *Moreau v. Air France*, 356 F.3d 942, 947 (9th Cir.2003).

While *Real* and *Torres–Lopez* indicate that supervision over the quality of the work could be one consideration to support a finding of control, subsequent cases, such as *Moreau v. Air France* and *Zhao v. Bebe Stores, Inc.*, 247 F.Supp.2d 1154 (C.D.Cal. 2003), indicate that supervision over quality control with little more does not contribute to a finding of an employment relationship.[8] In *Moreau*, the Ninth Circuit found that there was not an employment relationship when, among other factors, an airline had no ability to directly control the workers, "but would instead communicate any complaints about performance to the service company's supervisors." *Moreau*, 356 F.3d at 950–51. In addition, while the airline was very specific about how it wanted its work performed and checked to ensure that its standards were met, it was "noteworthy" that "much of the indirect supervision or control exercised by Air France over the ground handling employ-

ees was purportedly to ensure compliance with various safety and security regulations." *Id.* at 951.

In *Zhao*, a district court noted that, while a national clothing retailer employed quality control personnel at a garment manufacturer's manufacturing facility— even to the point of one quality control supervisor keeping an office at the facility—"the record [fell] short of demonstrating that this involvement could be properly characterized as control," since the garment manufacturer "had its own supervisors who were primarily responsible for the day to day management of its employees." *Zhao*, 247 F.Supp.2d at 1160.

As in *Moreau*, Delano Farms was specific about the quality of grapes it desired. Every day the Delano Farms sales team would tell Terry Bangi what types of grapes customers demanded and the type of container those grapes would be packed in. (Tr. 241:12–242:1, Ex. 109.) To ensure the quality of the grapes, testimony revealed that Delano Farms largely employed quality control personnel in the cold storage facility, where the Delano Farms personnel would inspect grapes for weight, size, and other attributes. (Tr. 369:12–370:13.) Quality control personnel also occasionally operated outside the cold storage facility, such as when Delano Farms designated tractor or irrigation workers to inspect grapes in the fields, (Tr. 318:20–319:7), or when Sylvia Mendez Villa and Maria Mendez ("the Twins") were hired to examine quality control in the fields from 2009 until 2011, (Tr. 289:18–20).[9] Delano

---

**8.** The court recognizes that *Zhao* and *Moreau* analyzed joint employment relationships under the FLSA, rather than under the AWPA. However, the AWPA incorporated the definition of the FLSA, *see* 29 U.S.C. 1802(5), and both *Zhao* and *Moreau* looked to the regulations passed under the AWPA or cases such as *Torres–Lopez* when analyzing whether a joint employment relationship existed, *Moreau*, 356

F.3d at 947–48, *Zhao*, 247 F.Supp.2d at 1157–58. Thus, the court finds them instructive on the issue of employer control under the AWPA.

**9.** Even the extent of quality control in the field was not constant. While there was some testimony that Delano Farms employed someone to check quality control before the Twins

Farms also employed a USDA inspector, (Tr. 699:12–700:5), and instituted a tracking system that identified the particular source of grapes as they came in from the fields, (Tr. 587:18–588:5). Despite defendants' attempts to characterize the system as a way to track or oversee the workers' productivity, Scott Quashnick's testimony revealed that Delano Farms implemented the system to quickly identify the source of the grapes in case a shipment of grapes is recalled due to health and safety concerns. (Tr. 588:6–19.)

In addition to quality control, Delano Farms made certain agricultural decisions, such as what varieties of grapes to plant and when spraying for pesticides should occur. (Tr. 499:1–7.) Other agricultural decisions were discussed jointly with Contractor, such as when the harvest season should start and how pre-harvest maintenance such as pruning, suckering, and tipping should be performed. (Tr. 211:4–217:24, 499:6–500:4.) Delano Farms occasionally discussed whether coming rain would interfere with harvest. (Tr. 217:3–22.)

Delano Farms did not, however, supervise fieldwork as it was being performed. When working in the fields, Contractor foremen and supervisors oversaw the picking and packing techniques while also disciplining employees. (Tr. 244:13–245:25, 389:19.) In addition, Contractor made many of the daily decisions regarding the harvest and pre-harvest work. After receiving an order, Terry Bangi would decide which field should be harvested to procure that particular quality of grape and how many crews should be working in that field to procure the desired quantity. (Tr. 242:2–244:6, 390:17–21.)

Plaintiffs attempted to show that Delano Farms exercised control over the fieldwork, such as picking, through their employment of the Twins. However, the Twins recognized that their work was to be confined to checking the quality of the grapes at the tables, (Tr. 268 11–19, 274:13–17), and that, rather than directly addressing the workers while the workers were picking the grapes, any issue with quality were to be addressed to the Contractor's supervisors or foremen, (Tr. 329:17–330:15). While Sylvia Mendez testified that occasionally she would ask a foreman to instruct the workers on how to pick quality grapes, (Tr. 342:25–343:20), it appears that this was beyond the scope of her authority for Delano Farms.[10] (Tr. 394:9–22, 421:18–422:2, 715:22–716:20.) After approximately two complaints about the Twins' interactions with Contractor's foremen and supervisors, the Twins were moved into a quality control position in the cold storage facility. (Tr. 394:23–395–5, 422:12–426:14.)

As for control over the workers from the cold storage facility, when a box or tray of grapes did not meet weight requirements, specific crews of workers were removed from the fields and, bringing more grapes with them, transported to the cold storage facility to re-pack grape boxes or trays. (Tr. 535:14–536:12.) A Delano Farms quality control worksheet had a column entitled "repack," and evidence showed that the Twins, when conducting quality control in cold storage, indicated that some boxes needed to be repacked. (Ex. 7.)

were hired in 2009, but that the person was fired or moved to cold storage, thereby creating a period of time in which there were no dedicated Delano Farms quality control personnel in the field for a period of time. (Tr. 419:1–18.)

10. The Twins also did not begin their employment with Delano Farms until April 2009, only two months before the litigation was filed. (Tr. 339:19–25.) Little testimony was presented regarding control over fieldwork during the prior years at issue in this litigation.

However, no evidence was presented that Delano Farms quality control personnel made the decisions to call in a crew from the field, nor was any evidence presented that Delano Farms encouraged this policy. Rather, the evidence implies that it was Contractor's decision to call the same workers who packed the boxes in from the fields to repack in the cold storage facility. (Tr. 392:17–23.)

In addition, the communication between Delano Farms and Contractor was qualitatively different from that at issue in *Torres–Lopez*. In *Torres–Lopez*, one of the farm labor contractor's supervisors in the fields would communicate up to four times a week with one of the grower's supervisors to make sure that the grower was satisfied with the quality of work being performed. *Torres–Lopez*, 111 F.3d at 642. Here, the daily communications between Contractor and Delano Farms largely consisted of the Contractor receiving messages from Delano Farms' sales team regarding what type of grape their customers demanded. Contractor would also communicate regularly with Ryan Randall about pesticide spraying schedules. (Tr. 586:6–587:8.) These communications were not meant to guarantee to Delano Farms that the workers were performing satisfactorily, but were instead intended to communicate customer demands and ensure the safety of the workers.

As in *Moreau* and *Zhao*, Delano Farms' control was largely focused on ensuring quality and safety, and thus was qualitatively different from the control in *Torres–Lopez*. *See Moreau*, 356 F.3d at 951. The court recognizes that Delano Farms made some of the agricultural decisions that would be expected of a grower, such as when harvest season would begin, indicating some control over the work. *See Torres–Lopez*, 111 F.3d at 642. However, unlike *Torres–Lopez*, Delano Farms did not closely supervise the fieldwork as it was being performed. *See Moreau*, 356 F.3d at 947; *Torres–Lopez*, 111 F.3d at 642. Since Delano Farms' control over the work was confined to supervision of quality control and agricultural decisions that would be expected of a grower, the degree of control only minimally suggests an employment relationship between Delano Farms and Contractor.

### b. *Opportunity for Profit or Loss*

In *Real*, the Ninth Circuit considered a payment structure in which the putative employer paid the sublicensees a percentage of the net proceeds of sale of the crop, less certain expenses. *Real*, 603 F.2d at 752. The court found that the sublicensees' opportunity or loss depended more upon D.S.A. and Driscoll's managerial skills "in developing fruitful varieties of strawberries, in analyzing soil and pest conditions, and in marketing" than upon the sublicensee's "judgment and work in weeding, dusting, pruning, and picking." *Id.* at 755.

The payment structure between Delano Farms and Contractor differs markedly from that at issue in *Real*. In *Real*, payment to the sublicensee was determined, in part, by the price that D.S.A. received for the crop in the marketplace. If D.S.A. decided to lower the price of its crop in the marketplace or chose a less desirable variety, the sublicensees would receive less profit due to no fault of their own.

Here, in contrast, Delano Farms paid Contractor the hourly wages of Contractor's workers and any box bonus, plus a commission of about thirty-seven-and-a-half percent of the workers' hourly wages. (Tr. 225:19–25.) Fluctuations in the price of table grapes would not affect Contractor's profit or loss.

However, while Contractor's profit or loss did not depend upon Delano Farms' marketing acumen, the payment structure between the two parties nonetheless limit-

ed Contractor's ability to profit or loss according to its managerial skill. Kalem Barserian, a grape grower with many years of experience in the grape industry, testified that a standard payment structure in the industry for picking is to pay by the number of boxes picked. (Tr. 766:14–767:9.) Under an arrangement where a grower pays a fixed fee per unit of production or pays a flat fee for the entire job, the contractor has significant discretion to control the major costs of its operation. Its profit or loss is determined by how it manages those costs, including labor, materials, and equipment for the operation.

Here, however, Delano Farms paid Contractor the hourly wages of the workers in the field and any box bonus, plus a fixed percentage commission of the overall wages. Contractor's profit or loss was derived from the percentage commission paid on top of the hourly wages of its workers. Delano Farms therefore restricted Contractor's opportunity for profit or loss by restricting Contractor's control over one of its key costs-labor. Delano Farms also provided many of the packing materials used by contractor. (Tr. 723:11–725:5, Ex. 109.) By setting the wages of its workers and providing the materials to be used in the packing of the grapes, Delano Farms removed discretion over two key costs that would otherwise provide Contractor an opportunity to profit or loss depending upon Contractor's management of those costs. While Contractor did have an opportunity for profit or loss based upon its management of other costs such as equipment and office staff, (225:21–226:5), that opportunity was limited.

The court recognizes that payment by hourly wage does not always restrict a contractor's opportunity for profit or loss.

As explained by Kalem Barserian, a grower might wish to pay a contractor by hourly wage when the grower is fairly certain of the number of employees and hours required for the job. (Tr. 769:6–11.) In those situations, because the grower has a definite belief in the parameters of the project, paying an hourly wage is roughly equivalent to paying a flat fee. Here, however, there is no evidence that Delano Farms had any firm understanding of in the number of workers or hours required for the harvest.

Thus, payment structure between Delano Farms and Contractor restricted Contractor's opportunity for profit or loss based on its managerial skill.

### c. Investment in Equipment or Employment of Other Workers

Contractor provided significant investment in pickup trucks, pump trucks, generators, welders, portable toilets, office equipment, and tools for the workers. (Tr. 239:9–240:11.) The overall investment was approximated at under $400,000. (Tr. 166:19–21.)

In *Real*, the Ninth Circuit determined that the fact the sublicensees' "investment in light equipment—hoes, shovels and picking carts—[was] minimal in comparison with the total investment in land, heavy machinery and supplies" by the grower undercut the growers' assertion that the workers were independent contractors. *Real*, 603 F.2d at 755. The court further recognizes that Contractor's $400,000 investment is likely far less than Delano Farms' investment in land, equipment, and materials.[11] However, the facts in *Real* can be distinguished from the facts here because Contractor's investment is

---

11. Delano Farms' equipment used to produce the crop included tractors, trucks, spray rigs, discs, drills, dusters, and other equipment

used in the fields, (Tr. 726:15–727:23), but the total value of this equipment was not estimated.

far greater than the workers' minimal investment in hoes, shovels, and picking carts discussed in *Real. Id.*

In addition, while evidence indicated that Delano Farms constituted "fifty percent or better" of Contractor's business, (Tr. 232:4–235:15, Ex. 9), Contractor provided field labor services to a variety of other growers, including Four Star Fruit, MDR, R.L. Ritchie, Lamanuzzi & Pantaleo, Blanc Vineyards, Red Cedar Vineyards, and Central Coast Farms over the past ten years, (Tr. 179:10–21). Contractor employed supervisors on these other farms and could move crews to them as needed. (Tr. 200:9–201:4.) Kalem Barserian also testified that one of the efficiencies of farm labor contractors is their ability to actively employ workers for a greater percentage of the year by employing them at different farms. (Tr. 758:22–759:8.) While a large percentage of Contractor's employees might have worked at Delano Farms during harvest, the evidence indicates that Contractor employed a significant number of workers at a variety of other farms.

#### d. *Special Skill*

In addition to providing the pre-harvest work, picking, and supervision of field activities, Contractor managed and coordinated a workforce consisting of several thousand farm laborers working over thousands of acres.[12] After receiving a sales report from Delano Farms indicating an amount and type of grape, it was Contractor's responsibility to determine how many crews should be assigned to each field and communicate the demands of Delano Farms to its crews. Contractor also contacted the "swamping" contractor to coordinate moving the packed grapes from the fields to cold storage, (Tr. 210:9–16), and arranged for materials to be delivered to workers in the fields, (Tr. 689:2–14). Contractor also taught this large workforce how to complete the pre-harvest and harvest tasks required by Delano Farms. (Tr. 310:22–25.) Joe Campbell testified that Delano Farms hired Contractor because Delano Farms did not have the expertise to manage such a large workforce. (Tr. 402:25–403:15.) Overall, coordinating and teaching the work on such a large scale required special skill beyond the ken of Delano Farms.

#### e. *Permanency of Working Relationship*

Under its various forms, Contractor has provided services to Delano Farms since Delano Farms' inception over nineteen years ago. (Tr. 454:14–20.) Delano Farms continues to use Terry Bangi's most recent farm labor contracting organization as a source of farm labor. (Tr. 201:16–20.) In addition, Terry Bangi's testimony implied that the parties assumed that Contractor would provide farm labor from year to year, with changes to wage rates occurring only occasionally, often when the minimum wage rate changed. (Tr. 157:6–23.) Thus, there was significant permanency in the working relationship between Contractor and Delano Farms.

#### f. *Integral Part of Delano Farms' Business*

Pre-harvest work, picking, packing table grapes for sale, and coordinating the work of a large number of fieldworkers are undoubtably services that are integral to Delano Farms' business, because unless these services were performed, Delano Farms

---

**12.** In *Real,* the focused exclusively on whether the fieldwork required special skill. *See Real,* 603 F.2d at 755 ("The services performed by the appellants consist primarily of physical labor, requiring no special technical knowledge or skill."). However, in *Real* the court was analyzing whether individual farmers with three acres were independent contractors. The court did not have the opportunity to consider whether the large, coordinated operations at issue here required special skill.

"would not have been able to realize any of the economic benefits from its substantial investment" in growing the table grapes. *Torres–Lopez,* 111 F.3d at 644.

### g. Additional Considerations– Shared Premises

In determining whether there is economic dependence, the court is to consider "all of the circumstances" relevant to the issue. 29 C.F.R. § 500.20(h)(4). In *Moreau v. Air France,* the Ninth Circuit considered the use of shared premises when deciding whether the airline jointly employed ground handling workers. *Moreau,* 356 F.3d at 952. Looking at the relationship between Delano Farms and Contractor, the court finds that, in addition to the factors listed in 29 C.F.R. § 500.20(h)(4), a consideration of shared premises is relevant to the question of economic dependence between Delano Farms and Contractor.

The *Moreau* court found that a ground handling contractor subleasing space from the airline at a percentage above the prevailing rental rate did not indicate a special relationship between the parties. *Moreau,* 356 F.3d at 952. Another contractor provided a small office free of charge to the airline, but this arrangement also did not indicate a special relationship when the practice was customary and the cost was covered by service charges billed to the airline. *Id.* Finally, a third contractor provided the airline with over 2,500 square feet of office space "free of charge" and the airline's logo appeared on the side of the contractor's building, but this arrangement also did not indicate a special relationship because the office space was part of the contract between the parties and was "obviously a negotiated point" that was factored into the economics of the deal. *Id.*

Here, Delano Farms provided a several-acre facility to Contractor, called the Richgrove property, almost from the inception of Delano Farms. (235:25–236:11.) The Richgrove property included two to three farmhouses, one of which Contractor used as an office for all of its operations, a tin storage warehouse, and an old cold storage facility used by Delano Farms (Tr. 235:25–238:2). Contractor stored its equipment on the site. (Tr. 240:16–22.)

Terry Bangi testified that Contractor paid rent on the property for the first year or so, but then stopped paying rent in exchange for maintenance and improvement of the property. (Tr. 238:6–239:8.) Joe Campbell also testified that Contractor did, in fact, pay rent on the property for a short period of time. (Tr. 405:12–406:4.) Campbell also testified that Contractor stopped paying rent on the Richgrove facility, located on the east side of the property, when Contractor agreed to buy a separate house on the west side of the property, approximately ten miles away. (Tr. 406:5–407:18.) Campbell testified that he would offer Mr. Bangi the opportunity to buy the house if Mr. Bangi would keep someone on the property to look after it.[13] (Tr. 406:9–15.) Campbell also testified that Mr. Bangi had to maintain the Richgrove property as part of the bargain.

Here, as in *Moreau,* there appears to have been a deal between the two parties in which Contractor contributed value by maintaining and improving the property in exchange for use of the property. Sharing the Richgrove Property, therefore, does not indicate that Contractor was an employee of Delano Farms rather than a bona fide independent contractor.

---

**13.** Delano Farms became concerned about the future of the western property when two Rottweilers, apparently left at the property by their previous owners, killed a stray dog on the property. (Tr. 406:19–407:13.)

#### h. *Overall Economic Reality*

After considering the factors listed in 29 C.F.R. § 500.20(h)(4) and all relevant circumstances, the court concludes from the totality of the circumstances, considered as a whole, that the economic reality between Contractor and Delano Farms supports a finding that Contractor was not economically dependent on Delano Farms. Contractor therefore was a bona fide independent contractor. Since Contractor was not employed by Delano Farms, plaintiffs are not deemed to be employees of Delano Farms through their employment by Contractor. *See* 29 C.F.R. § 500.20(h)(4).

#### 2. *Joint Employment*

"If it is determined that a farm labor contractor is an independent contractor, it still must be determined whether or not the employees of the farm labor contractor are also jointly employed by the agricultural employer/association." 29 C.F.R. § 500.20(h)(5)(i). For the purposes of the AWPA, "[t]he definition of the term employ includes the joint employment principles applicable under the Fair Labor Standards Act." *Id.* § 500.20(h)(5).

■ Unlike the independent contractor analysis, which focuses on the relationship between the agricultural employer/association and the farm labor contractor, the joint employment analysis focuses on the relationship between the agricultural employer/association and the *worker.* Compare 29 § 500.20(h)(4) *with id.* at § 500.20(h)(5)(iii). In the joint employment analysis, "the ultimate question to be determined is the economic reality— whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." *Id.* § 500.20(h)(5)(iii).

■ In determining economic dependency, the court looks to both regulatory and non-regulatory factors.[14] *See Torres–Lopez,* 111 F.3d at 640. In *Torres–Lopez,* the court looked to five regulatory factors codified in 29 C.F.R. § 500.20(h)(4)(ii) (1996) and eight non-regulatory factors. Subsequent to the Ninth Circuit's decision in *Torres–Lopez,* the relevant regulations were amended to remedy the overly restrictive definition of joint employment used by some courts, and the new regulatory factors adopted many of the non-regulatory factors explored in *Torres–Lopez. See Charles v. Burton,* 169 F.3d 1322, 1328 n. 10 (11th Cir.1999); *Torres–Lopez,* 111 F.3d at 641 n. 6.[15] The regulatory factors under current AWPA regulations include:

(A) Whether the agricultural employer association has the power, either alone or through control of the farm labor

---

**14.** Delano Farms urges this court to apply the four factors identified in *Bonnette,* 704 F.2d 1465 (9th Cir.1983), which are "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette,* 704 F.2d at 1470.

However, as noted by the court in *Moreau v. Air France,* the four *Bonnette* factors "roughly correspond" to the regulatory factors applied in *Torres–Lopez. Moreau v. Air France,* 356 F.3d 942, 950 (9th Cir.2003). The regulatory factors considered in *Torres–* *Lopez* were in turn amended in order to remedy courts' application of an overly-strict interpretation of control in the joint-employer context. *See Torres–Lopez,* 111 F.3d at 641 n. 6.

**15.** In *Torres–Lopez,* the court applied the following regulatory factors: (A) the nature and control of the workers; (B) the degree of supervision, direct or indirect, of the work; (c) the power to determine the pay rates or methods of payment of the workers; (D) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (E) preparation of payroll and the payment of wages. *Torres–Lopez,* 111 F.3d at 639–40 (citing former 29 C.F.R. § 500.20(h)(4)(ii) (1996)).

contractor to direct, control, or supervise the worker(s) or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties);

(B) Whether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);

(C) The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;

(D) The extent to which the services rendered by the workers are repetitive, rote tasks requiring skills which are acquired with relatively little training;

(E) Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;

(F) Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and

(G) Whether the agricultural employer/association undertakes responsibilities in relation to the workers which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

29 C.F.R. § 500.20(h)(5)(iv). The regulatory factors "are illustrative only and are not intended to be exhaustive." *Id.*

In *Torres–Lopez*, the Ninth Circuit also considered a number of non-regulatory factors in its analysis, including the following:

(1) whether the work was a specialty job on a production line;

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

(3) whether the premises and equipment of the employer are used for the work;

(4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;

(5) whether the work was piecework and not work that required initiative, judgment or foresight;

(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

(7) whether there was permanence in the working relationship; and

(8) whether the service rendered is an integral part of the alleged employer's business.

*Torres–Lopez,* 111 F.3d at 640 (internal quotation marks and citations omitted).

"No one factor is dispositive of the ultimate question; nor must a majority or a particular combination of factors be found for an employment relationship to exist...." 29 C.F.R. § 500.20(h)(5)(iv). The Ninth Circuit instructs that "[a] court should consider all ... factors ... 'relevant to the particular situation' in evaluating the 'economic reality' of an alleged joint employment relationship." *Torres–Lopez,* 111 F.3d at 639 (quoting *Bonnette,* 704 F.2d at 1470). The court will not mechanistically apply these factors, *see*

*Bonnette,* 704 F.2d at 1470, nor will it evaluate the factors in a "mathematical formula," *Antenor,* 88 F.3d at 933. Ultimately, the "determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." *Rutherford,* 331 U.S. at 730, 67 S.Ct. 1473.

### a. *Regulatory Factors*

#### i. *Power to Direct, Control, or Supervise, Both Directly and Indirectly*

■ As discussed above, Delano Farms' power to direct, control, or supervise the activities of the workers was confined to quality control and agricultural decisions that would be expected of a grower. Unlike *Torres–Lopez,* however, Delano Farms did not exercise close control over the fieldwork. *See Torres–Lopez,* 111 F.3d at 642. Thus, Delano Farms' power to direct, control, or supervise the work was minimal.

#### ii. *Power to Hire or Fire, Modify Employment Conditions, or Determine Rates/Methods of Pay*

It is undisputed that Contractor hired and fired the field workers through its foremen. (Tr. 121:8–122:24.) As for employment conditions, Contractor set the field conditions of the workers and determined the workers' break periods. (Tr. 388:15–389:11.) While Terry Campbell from Delano Farms suggested that the workers might benefit from Gatorade, (Tr. 92:3–13, 218–18–24), there was no evidence that this was anything more than a suggestion, and Contractor unilaterally decided to stop providing Gatorade in the fields due to concerns about diabetes, (Tr. 94:3–16, 219:2–15). Testimony from Terry Bangi indicates that any discussion about the

timing of the workers' breaks was simply encouragement from Joe Campbell that Contractor follow the law regarding break times. (Tr. 215:19–216:3.) There is also no evidence that the policy of removing workers from the fields to re-pack boxes was instituted by Delano Farms or that Delano Farms required Contractor to remove certain crews from the fields. Thus, from the evidence provided it appears that Delano Farms did not have the power to modify the employment conditions of the workers.

In *Torres–Lopez,* the court recognized that the grower exercised some power over the workers' wages when it increased the farm labor contractor's compensation during the early harvest season to allow the workers to draw higher wages. *Torres–Lopez,* 111 F.3d at 643. Here, the terms of the oral contract [16] between Contractor and Bangi was explicitly based upon the wages earned by Contractor's workers, with Contractor's commission set as a percentage of the overall wages paid to its workers. (Tr. 225:6–25.) Terry Bangi and the Delano Farms management team explicitly discussed the workers' wage rate when setting the terms of their contract—indeed, it seems to be the primary term discussed by the parties. While the parties disagree as to who had the final say over the workers' wages and how much negotiation was involved, it is clear from Delano Farms' testimony that it wanted to exercise some control over the workers' wages. Terry Bangi testified that when Jim Middleton and Joe Campbell discussed the workers' wages with him, both "wanted to be above the industry [standard]." (Tr. 220:7–9, 220:20–23.) Joe Campbell testified that Delano Farms wanted to set the rate above the industry

---

**16.** The contracts between Delano Farms and Contractor were entirely oral until June 2011, a date more than two years into the litigation. (*See* Ex. 1.) Even when the parties did sign a contract, the payment terms were left blank but were agreed to orally. (*See* Tr. 156:11–14, Ex. 1.)

standard "to have the best people" and to be "be known as an ... employment friendly company." (Tr. 400:13–19.) The testimony therefore reveals that Delano Farms wanted to have, and did indeed exercise, some control over workers' wages in order to gain the benefit of a better reputation.

### iii. *Permanency and Duration*

In *Torres–Lopez,* the court found that there was "no permanency in the working relationship because the farmworkers only harvested for [the grower] for thirty-two days during the period at issue." *Torres–Lopez,* 111 F.3d at 644. While evidence does not disclose how many days the workers performed services for Delano Farms, Terry Bangi did testify that the majority of the employees are seasonal, and that even the foremen and supervisors go on unemployment at the end of a season. (Tr. 177:15–22.) While some workers may have regularly returned to harvest Delano Farms year after year, (*see* Tr. 91:14–23), Contractor could, and did, assign workers to different growers as needed, (Tr. 200:9–201:4).

Thus, the evidence suggests that the permanency and duration of the relationship between the workers and Delano Farms was minimal.

### iv. *Remaining Regulatory Factors*

Workers learned the techniques required for pre-harvest work in fifteen to thirty minutes and often mastered the techniques within a matter of days. (Tr. 416:16–463:15, 526:9–527:21.) Thus, pre-harvest and harvest work can be quickly learned and is a repetitive, rote task that is similar to production on an assembly line. *See Torres–Lopez,* 111 F.3d at 644 (holding that the job of picking cucumbers is "piecework that requires no great initiative, judgment, or foresight, or special skill" (internal quotation marks and citations omitted)); *Real,* 603 F.2d at 755 (holding that the fieldwork at issue "con-sisted primarily of physical labor, requiring no special technical knowledge or skill"). The work is also an integral part of Delano Farms' overall business operation. Finally, it is undisputed that the work is performed entirely on Delano Farms' premises.

However, Delano Farms did not undertake responsibilities which are commonly performed by employers. Delano Farms did not manage the workers' payroll, provide workers' compensation insurance, provide field sanitation facilities, or provide housing or transportation. (Tr. 403:23–1.) As for providing equipment required for the job, Craig Neville testified that Contractor provided shears to plaintiffs, (Tr. 95:15–16, 96:9–11, Exs. 128 & 130), and plaintiffs did not produce any admissible evidence to the contrary, (Tr. 96:20–23). Contractor also provided the white picking trays used by the workers in the field to collect grapes before bringing them to the table where they were packed. (Tr. 262:6–8, 362:9–14.) Delano Farms provided packing materials, such as boxes and clam-shells, that would be shipped to customers, as well as black and tan trays that Delano Farms would use to store grapes in the cold storage. (Tr. 362:15–363:16, 696:21–699:4.) These black and tan trays, however, were not equipment used to conduct the work of harvest, but were rather equipment used in shipping and storage, and thus one would not expect Contractor to provide them. Therefore Delano Farms did not undertake any responsibilities commonly performed by an employer.

### b. *Non–Regulatory Factors*

### i. *Whether the Contract Could Pass to Another Contractor Without Material Changes*

In *Torres–Lopez,* the Ninth Circuit considered the non-regulatory factor of "whether responsibility under the contracts between a labor contractor and an

employer pass from one labor contractor to another without 'material changes[.]' " *Torres–Lopez,* 111 F.3d at 640. In support of its determination that the grower constituted a joint employer, the Ninth Circuit acknowledged that "there were no 'material changes' in the terms of the oral contracts between [the grower] and farm labor contractors" when the "contracts were standard for the industry and involved little negotiation." *Id.* at 643 (quoting *Rutherford,* 331 U.S. at 730, 67 S.Ct. 1473) (internal citation omitted).

Here, testimony shows that Delano Farms and Contractor both endeavored to determine the current industry standard for wage rates, box bonuses, and commissions before discussing the terms of the contract. (Tr. 225:8–14, 400:7–12.) The resulting contracts included terms that deviated only slightly from these standards. (Tr. 225:15–17, 400:7–12.) For example, the commission paid to Contractor for a number of years was thirty-seven-and-a-half percent, (Tr. 225:23–25, 226:20–22, 402:6–11), well within the industry range of thirty to forty percent, (Tr. 226:23–25, 766:7–13). No evidence suggests that the discussions ever involved unique terms or contemplated substantial deviation from the industry standard. Thus, it appears that the contract between Delano Farms and Contractor could pass from Delano Farms to another farm labor contractor without any material changes, thereby supporting a finding of joint employment.

ii. *Business Organization that Could Shift as a Unit From One Worksite to Another*

In *Torres–Lopez,* the farmworkers did not have a business organization that could or did shift from one worksite to another because "individual farmers would learn by mouth that the cucumbers were ready for picking and find their own way to the cucumber field," where the field labor contractor "then selected the farmworkers from the labor pool that showed up." *Torres–Lopez,* F.3d 111 at 644. Here, in contrast, the workers were part of organized crews that could shift from one worksite to another depending on the day. (Tr. 200:9–201:4.)

iii. *Opportunity for Profit or Loss*

The Ninth Circuit in *Torres–Lopez* determined that "the farmworkers had no opportunity for profit or loss depending upon their managerial skill [because] [t]hey worked at piece-rate and the amount of they earned depended solely upon the number of cucumbers they themselves picked." *Torres–Lopez,* 111 F.3d at 644 (internal quotation marks and citation omitted). Similarly here, plaintiffs were paid by the hour and at times were also paid a box bonus to be split among the three people in a crew depending upon how many boxes they picked in a day. (Tr. 397:17–22.) No evidence was presented that a worker's managerial skill could affect the workers' opportunity for profit or loss.

c. *Overall Economic Reality*

Looking at all relevant considerations, including both regulatory and non-regulatory factors, in determining the economic reality between Delano Farms and Contractor, the court concludes that plaintiffs had sufficient economic dependence on Delano Farms to support a finding that Delano Farms jointly employed plaintiffs with Contractor. Accordingly, the court finds that Delano Farms employed plaintiffs under the AWPA.

B. *Employment Under California Law*

■ The California Industrial Welfare Commission ("IWC") has the authority to promulgate regulations known as "wage orders" governing wages, hours, and working conditions in California. *Tidewater Marine W., Inc. v. Bradshaw,* 14 Cal.4th 557, 561, 59 Cal.Rptr.2d 186, 927 P.2d 296

(1996). In actions to recover unpaid minimum wages pursuant to California Labor Code section 1194, California courts rely on the definitions in the IWC's wage orders in determining whether an employment relationship exists. *Martinez v. Combs,* 49 Cal.4th 35, 52, 109 Cal.Rptr.3d 514, 231 P.3d 259 (2010). Wage Order 14 defines the employment relationships of agricultural workers and provides for certain minimum wages and employment conditions. *See* 8 Cal.Code. Reg. § 11140(1) ("This order shall apply to all persons employed in an agricultural occupation...."). The IWC's wage orders "do not incorporate the federal definition of employment." *Id.*

Under Wage Order 14, as in other IWC wage orders, there are three alternative definitions for the term "to employ." *Martinez,* 49 Cal.4th at 64, 109 Cal.Rptr.3d 514, 231 P.3d 259. "It means: (a) to exercise control over the wages, hours, or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Id.* 11140.

Under the "suffer or permit to work" definition, *Martinez* looked to early twentieth century child labor statutes and gave the phrase its "historical meaning," which was that "[a] proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Martinez,* 49 Cal.4th at 69, 109 Cal.Rptr.3d 514, 231 P.3d 259. *Martinez* held that the basis for liability under the "suffer or permit to work" definition "is the defendant's knowledge of and failure to prevent the [illegal] work from occurring." *Id.* Due to the limited scope of this trial, the court cannot resolve whether illegal work was occurring, let alone whether Delano Farms had knowledge of

the work. In addition, plaintiffs did not argue that Delano Farms is their employer under the common-law definition.

Under the "exercise control over wages, hours, or working conditions" definition, " 'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck." *Futrell v. Payday Cal., Inc.,* 190 Cal.App.4th 1419, 1432, 119 Cal.Rptr.3d 513 (2d Dist.2010). In *Martinez,* the California Supreme Court held that a strawberry merchant did not have power over plaintiffs' wages because, in part, "[the contractor] alone, with the assistance of his foremen ... determined [the employees'] rate of pay." *Martinez,* 49 Cal.4th at 72, 109 Cal.Rptr.3d 514, 231 P.3d 259. Furthermore, the farm labor contractor "operated a single, integrated business operation, growing and harvesting strawberries for several unrelated merchants and combining revenue from all sources ... [and] paid his employees out of those combined revenues and assets." *Id.*

■ Here, rather than Contractor alone setting plaintiffs' rate of pay, Delano Farms and Contractor expressly negotiated and set plaintiffs' rate of pay as part of their contract. Delano Farms negotiated over the workers' wage rate, and even expressed a desire to control those rates so that it would attract the best workers possible. Also, unlike the grower in *Martinez* who pooled his income from various sources and paid employee wages from that fund, Contractor appeared to pay its employees directly from the funds it received from Delano Farms when employees were working for Delano Farms. Delano Farms had "the power or authority to negotiate and set an employee's rate of pay," *Futrell,* 190 Cal.App.4th at 1432, 119 Cal.Rptr.3d 513, and thus it employed

plaintiffs under applicable California law, see 8 Cal.Code. Reg. § 11140(2)(G).

For the foregoing reasons, THE COURT HEREBY FINDS that at all times relevant to these proceedings defendant Delano Farms employed plaintiffs within the meaning of the Migrant Seasonal Agricultural Workers Protection Act, 29 U.S.C. § 1801 *et seq.,* and Wage Order 14 of the California Industrial Welfare Commission, 8 Cal.Code. Reg. § 11140.